[Civ. No. 25312. Second Dist., Div. Two. Mar. 8, 1962.]

DEVVY HODGES, Plaintiff and Appellant, v. RICHARD SEVERNS, Defendant and Respondent.

Horton, Gabler & Hathaway, Charles W. Gabler and Henry F. Walker for Plaintiff and Appellant.

Gibson, Dunn & Crutcher and F. Lee Coulter, Jr., for Defendant and Respondent.

ASHBURN, J.—Plaintiff was a guest in a Mercury station wagon, owned and operated by Mrs. Ruth Hill, when it collided with a Dodge truck owned by respondent Severns and operated by John Hislar in the course and scope of his employment for Severns. Plaintiff appeals from judgment for defendant Severns based upon a jury verdict. The action was dismissed as to Hislar after the evidence was closed.

Appellant claims error in the admission of evidence, in refusal to give a requested instruction, insufficiency of the evidence, and prejudicial remarks on the part of the trial judge preventing a fair trial.

In considering these matters it must be kept in mind that plaintiff herself was not guilty of any negligence; that negligence of Mrs. Hill is not imputable to plaintiff and any negligence of defendant's driver Hislar which contributed proximately to the accident establishes liability of defendant to plaintiff, does so even if that negligence is only one of the proximate causes and even though negligence of Mrs. Hill may have concurred with it in proximately bringing about plaintiff's injuries.

On November 13, 1958, at about 12:45 p. m., respondent's

pick-up truck, driven by Hislar, was traveling westbound on Venice Boulevard, a through street. Mrs. Hill was driving northbound on Military Avenue, an intersecting street. Plaintiff was a guest in the latter vehicle. The eastbound and westbound portions of Venice Boulevard are each 30 feet wide, and are separated by an 80-foot divider. The divider strip was formerly the Pacific Electric Railway right-of-way, and is a flat dirt area. At the entrance of Military Avenue to the southerly (eastbound) portion of Venice (southeast corner of the intersection) there is a boulevard stop sign controlling northbound traffic; a similar stop sign at the northwest corner of the intersection controls southbound traffic at the northerly entrance of Military Avenue to the westbound portion of Venice. There are no automatic signals or other stop signs in or about the intersection or said divider.

Venice Boulevard has three lanes (including the parking lane) both eastbound and westbound. Having stopped at the southerly entrance to the intersection, Mrs. Hill proceeded northerly across the eastbound portion of Venice Boulevard and the 80-foot divider; and, although there was no stop sign, she stopped her vehicle about a foot or so back from the north edge of the divider. Her car was traveling between 5 and 10 miles per hour up to this point as she crossed the intersection. She remained stopped long enough for two or three westbound cars to pass; she said they were going fast, at least 60-65 miles an hour. She testified that she looked to her right and the closest traffic appeared to be about a block away. She never saw defendant's truck before the collision. After stopping at the northerly edge of the divider, she proceeded in low gear, about 4 miles per hour, into westbound Venice and was struck by respondent's westbound truck.

Defendant Hislar testified that he was traveling westbound on Venice at about 35 miles per hour; that he had been traveling behind an automobile driven by one Perry Ittner, another employee of the respondent Severns; that he had been following about 30 to 40 feet behind Ittner; he first saw the Hill vehicle, stopped at the northerly edge of the divider, at about the same time the westbound Ittner vehicle was passing it; he then was about 40 or 50 feet from the intersection. He admitted having previously told a police officer that this distance was 100 feet. He applied his brakes 15 to 20 feet east of the intersection, but his truck, after striking the Hill vehicle, continued past the intersection some 30 or 40 feet before coming to a stop. At the time of the impact, according

to this witness, the Hill vehicle was approximately three-fourths of the way through the westbound portion of Venice, and his vehicle was in the No. 2 lane, the middle of the three westbound lanes of Venice.

In reviewing the sufficiency of the evidence we must accept as established all evidence and all inferences favorable to respondent which find substantial support in the evidence (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; *Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231]), although we are not required to ignore adverse proofs which are uncontradicted.

Military Avenue and Venice Boulevard, divided as it is by the old railway right-of-way, effect only a single intersection under the authorities. (*Blanton* v. *Curry,* 20 Cal.2d 793, 801-802 [129 P.2d 1] (and cases there cited); *Dawson* v. *Williams,* 127 Cal.App.2d 38, 41 [273 P.2d 75]; *Navajo Freight Lines, Inc.* v. *Shafer,* 179 Cal.App.2d 188, 193-194 [3 Cal.Rptr. 523].) To us this rule seems far more legalistic than realistic. But, as stated in the *Dawson* case, page 41: "Any change will have to come through legislative action." Nothing along that line has been done.

As traffic on Venice Boulevard is controlled by stop signs it constitutes a through highway (Veh. Code, § 82.5),[1] and section 552 provides: "*Vehicle Entering Through Highway.* (a) The driver of any vehicle shall stop as required by Section 577 of this code at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard. A driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right of way to the vehicle so about to enter or cross the through highway. . . ."

Under the authorities above cited the northbound Mercury of Mrs. Hill, having stopped at the entrance to Military Avenue, was required to yield the right-of-way to all westbound vehicles on the north or westbound portion of the boulevard which were approaching so closely on that through highway as to constitute an immediate hazard. This she did. She then proceeded to cross the divider of the through highway at a

[1]All references to Vehicle Code point to the same as it existed at the time of the accident, being prior to the recodification of 1959.

speed not exceeding 10 miles per hour and then had the right-of-way over all westbound vehicles approaching on Venice Boulevard, but she did not claim that right-of-way for she stopped a foot or so south of the north edge of the divider and there remained while two or three westbound cars passed. Plaintiff and Mrs. Hill testified that the collision occurred in the middle lane and Hislar said the Hill car was three-fourths of the way through the westbound lanes and the truck was in lane two, the center lane. ■ Over appropriate objections Police Officer Hyde was permitted to read from a police report to the effect that the point of impact was four feet north of the south curb line of (northerly portion of) Venice, and 18 feet west of the east curb line of Military Avenue. Though this evidence was erroneously received as hereinafter shown, it must be considered in determining the question of sufficiency of the evidence. (*Waller* v. *Southern Calif. Gas Co.,* 170 Cal.App.2d 747, 757 [339 P.2d 577].)

Our problem here is whether the jury was warranted in finding Hislar not guilty of proximate negligence. ■ The jury well may have reasoned as follows: Hislar discovered the Hill car when it was standing to let the Ittner truck pass in front of it. At that time Mrs. Hill had temporarily waived her right-of-way by stopping at the south side of the westbound lanes though there was no stop sign there. When she was at that point Hislar saw her car. He was so close and going at such speed that he could not stop in less than 40 feet after striking another car with much force. He had no reason to anticipate that Hill would attempt to cross his path. Her stopping was an implied invitation to him to cross in front of her (see *Minton* v. *Gobble,* 42 Tenn.App. 475 [304 S.W.2d 337, 340]; *Vines* v. *Hartford Accident & Indemnity Co.* (La.App.) 36 So.2d 729, 731; *Cragin* v. *Sabine,* 97 N.H. 228 [84 A.2d 843, 844]; *Hammond* v. *Emery-Bird-Thayer Dry Goods Co.* (Mo.) 240 S.W. 170, 174). He had a right to assume that she had seen him and would yield the right of way to him. As he was about to pass her she started to pull into the westbound lanes and he applied his brakes, being then some 15 to 20 feet from the intersection. That was too late; the Hill car was struck on the right front fender by the left front of the truck. According to plaintiff and Mrs. Hill and Hislar this occurred in the middle lane. But if the impact occurred where the policeman said, four feet north of the south curb line, it was in the first lane and by that token Mrs. Hill pulled in front of defendant at a time and place

where there was no opportunity for him to avoid a collision. On this theory Hislar could be found not guilty of actionable negligence.

We find enough evidence to sustain the verdict for defendant. The question is very close and the evidence adverse to defendant so persuasive that appellant's claims of error deserve unusually careful consideration.

The jury could have found the facts to be these: Mrs. Hill stopped at the southerly entrance to Venice Boulevard, a through highway, let such vehicles go by as constituted an immediate hazard, and then had the right-of-way until she was entirely across the northerly or westbound lanes. Both plaintiff and Mrs. Hill looked to the east as they were near the north line of the divider. Neither of them saw the truck, which must have been a long way off; the closest cars were a block to the east. Hislar had lived in the vicinity and knew the intersection for many years. It was his duty to look for northbound cars on Military Avenue, discover their presence and yield the right-of-way to them. The fact that Mrs. Hill had stopped to let Ittner pass would not effect a waiver of her right-of-way if he had violated it and made her stopping necessary in the exercise of reasonable care. Hislar was traveling at a rate of speed which dictated that he discover the Hill car before he was within 40 feet of the intersection; he told the officer he was then 100 feet away. Mrs. Hill did not dart out in front of him, she was not going more than 4 miles per hour and he should have seen her; she had a right to assume that he did. At his confessed rate of 35 miles an hour he was going some 52½ feet per second and application of the brakes only 15 to 20 feet east of the intersection was plainly too late. The posted speed limit was 40 miles per hour and the officer testified that the basic speed was, in his opinion, 25 miles an hour; defendant must have been exceeding 40 miles for the impact whirled the Hill car around causing it to strike and break a steel pole located at the northwest corner of the divider and in the process left 19 feet of skid marks from the truck; it was going so fast that it traveled across Military Avenue, 40 feet in width, and some 30 to 40 feet beyond the intersection before coming to a stop. That was negligent indeed. It is in the light of such possible findings that appellant's claims of error must be viewed.

█ Assigned as error is a series of rulings permitting

Officer Hyde, an investigating officer, to read into evidence a purported transcript of a report of the accident made by him.

The objection that the report was privileged under sections 484 and 488, Vehicle Code, was properly overruled. (*Stroud* v. *Hansen*, 48 Cal.App.2d 556, 559-560 [120 P.2d 102] ; *Carroll* v. *Beavers*, 126 Cal.App.2d 828, 836-837 [273 P.2d 56].) Those sections relate only to written accident reports made by motorists involved in an action.

Officer Hyde testified that he vaguely remembered the accident and being at the scene; also that he made notes at the scene and later transcribed them onto a tape recorder which was turned into the record bureau and "typed up at a later date." He had independent recollection of very few of the events of that day; reexamination of the report did not refresh his recollection. "We have had many accidents on Venice Boulevard, at, near, and all around that intersection. The majority of them are substantially the same as this, the way this accident happened, and I just don't—— I can't pick this one out in my mind plain enough to actually get up here and tell you that I remember it."

Counsel for defendant undertook to bring the report within section 2047, Code of Civil Procedure, which is set forth in the footnote.[2] Objections to reading the report having been overruled the court permitted the witness to read from the report as follows: "THE WITNESS: 'Vehicle 1 traveling north on Military Avenue in lane No. 1 was struck broadside by Vehicle 2 traveling west on the north portion of Venice Boulevard in lane W-1.' Q. BY MR. TUCKER: Which lane is W-1, Officer? A. That is the lane of traffic near the center of the street or near the dividing island. . . . A. 'The point of impact was established by determination of 19 feet of front wheel skid marks left by Vehicle No. 2, by debris on the street, and was approximated by the statements of both parties involved, was found to be approximately four feet north of the south curb line of Venice Boulevard, north portion, and 18 feet west of the east curb line of Military Avenue, indicating

[2]Code Civ. Proc., § 2047: "A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution."

the east curb between the north and south portions of Venice Boulevard.' . . . Q. By Mr. Tucker: What statements made by Mrs. Hill, the driver of vehicle No. 2, to you indicated the point of impact, if any? . . . The Witness: She was there and told me, pointed out the approximate location of where the accident occurred. [The witness testified that he actually interviewed her at the scene.] . . . Q. By Mr. Tucker: When she saw that there were no cars coming westbound on the northerly portion of Venice, she started forward and just as the front of her car entered the north portion of Venice Boulevard she was struck on the right side? A. Yes.'' The officer conceded that he did not interview Hislar at the scene; indeed, he seems not to have questioned him at all. The officer did not state that he had ever checked the transcript from which he read nor did he say that it correctly reflected what he had transcribed onto the tape recorder and of course he could not say that he knew the same to correctly reflect what his original notes showed.

It has been held that the last sentence of section 2047, Code of Civil Procedure, authorizes the witness to read the memorandum after proper foundation laid (*Anderson* v. *Souza,* 38 Cal.2d 825, 832 [243 P.2d 497]), but the foundation was lacking in this case in several respects. There was no showing that the document read by the witness accurately reproduced what he had written in his original notes. His fixing of the point of impact was not competently done. He relied upon three elements—debris on the street, skid marks and statements of ''both parties involved,'' which would mean Hill and Hislar, who were the drivers involved in the accident. Debris alone cannot fix the point of impact (*Waller* v. *Southern Calif. Gas Co., supra,* 170 Cal.App.2d 747, 752). The skid marks could not suffice for the officer testified that he would not say whether it was in lane two or not, and did not state that it began four feet north of the south curb; he had no recollection of having measured the skid mark. Statements made by Hislar at some subsequent time (and probably to another investigating officer) was pure hearsay and could not enter into an admissible opinion as to where the impact occurred. The same is true of Mrs. Hill's statements made at the scene.

 Manifestly, a witness cannot testify from a memorandum based upon hearsay, for this would be to permit to be done indirectly what cannot be done directly (see *People* v.

*Miller,* 134 Cal.App.2d 792, 795 [286 P.2d 415]; *Steinhofer* v. *Georgeson,* 54 Cal.App. 550, 559, 562 [202 P. 350]); nor can a witness express an opinion as to a fact concerning which he has no personal knowledge; he may testify only as to matters of which he has derived knowledge from or through his own perceptions. "While the opinion of an officer who is trained in investigating accidents may be admissible as to the point of impact (*Zelayeta* v. *Pacific Greyhound Lines,* 104 Cal. App.2d 716 [232 P.2d 572]), such opinion is not admissible unless based on facts observed by the officer at the scene of the accident. Where the opinion is based on what witnesses told the officer, at least where objection is made, it is error to admit it." (*Ribble* v. *Cook,* 111 Cal.App.2d 903, 906 [245 P.2d 593].) (To same effect, *People* v. *Byars,* 188 Cal.App.2d 794, 807 [10 Cal.Rptr. 667]; *Kalfus* v. *Fraze,* 136 Cal.App.2d 415, 423 [288 P.2d 967]; *Stuart* v. *Dotts,* 89 Cal.App.2d 683, 686-687 [201 P.2d 820]; see also *Robinson* v. *Cable,* 55 Cal.2d 425, 429 [11 Cal.Rptr. 377, 359 P.2d 929]; *Hoel* v. *City of Los Angeles,* 136 Cal.App.2d 295, 309 [288 P.2d 989]; *Fireman's Fund Ins. Co.* v. *Romero,* 128 Cal. App.2d 331, 336 [275 P.2d 83]; *Manney* v. *Housing Authority,* 79 Cal.App.2d 453, 459 [180 P.2d 69]; Code Civ. Proc., § 1845.)

In *Robinson* v. *Cable, supra,* 55 Cal.2d 425, it appears that the officer's opinion may have been based partly on hearsay statements. In reversing the judgment upon another point, the court said at pages 428-429: "One officer, Mehl, had talked to defendant Cable and received from him his statement as to the point of collision, but Mehl testified that he reached his conclusion also from his examination of the debris and marks on the highway. On a retrial if these witnesses are called, their opinions can be strictly limited to the conclusions that they formed from their own examination at the scene, disregarding any hearsay information that they may also have received."

Respondent suggests that the statements made by Mrs. Hill to Officer Hyde were not hearsay in that (a) she had previously appeared as a witness at the trial and had testified that she had made such statements; and (b) they come within the res gestae exception. Even if respondent is correct in either premise, it would not affect the admissibility of the officer's opinion as to the point of impact, since he cannot base an opinion upon statements of others, hearsay or not.

Finally, it appears that Officer Hyde was not presented as an expert. ■■■■ Counsel for defendant said, in discussing the admissibility of the officer's testimony, that "no attempt was made to qualify this officer as an expert," and, as was said in *Waller* v. *Southern Calif. Gas Co., supra,* 170 Cal. App.2d 747, 752: "Only one who possesses expert qualifications can express an opinion as to point of impact." The admission into evidence of the contents of the report was error. ■■■■ It seems that some recognition of this fact lay back of the defendant's effort to bolster the foundation for the Hyde report through the testimony of Connie Nutter, who testified that she was a witness to the accident, had refreshed her recollection from the police report and gave a few facts pertaining to the collision which she witnessed from a block and a half away. She was then asked if she had been interviewed by Officer Hyde at the scene and replied in the affirmative. Over objection she was permitted to testify that she had read the police report on the previous day and "Q. BY MR. TUCKER: Were the statements on that police report which were attributed to you correct? A. Yes." The police report was not placed in evidence at any time and the statements which she thus verified were not placed before the court. Obviously, this examination could have but one purpose, that of shoring up the foundation for the reading of portions of the report into evidence by Officer Hyde.

That this was error of serious consequence is evident from the facts (1) that the plaintiff, Mrs. Hill and Hislar all testified that the collision took place in the middle lane, which connotes Mrs. Hill having proceeded slowly to the middle of the westbound lanes and to have been struck by defendant's driver who did not see her at all or did not see her until it was too late to veer away or otherwise avoid striking her; (2) that the reading from the officer's report is the only place in the record that places the point of impact in the most southerly of the westerly lanes of travel, which would mean that Mrs. Hill had darted out in front of the truck at such a speed and time as made it impossible for its driver to alter his course or avoid a collision.

Moreover, the error was accentuated by the court's insistence that plaintiff's counsel withhold all objections and content himself with a motion to strike after the jury had heard the evidence. We quote: "THE COURT: Well, I think he may proceed to get the evidence in at this time and, of course,

it will be subject to your motion to strike if he cannot properly justify it. . . . Mr. Gabler: If your Honor please, may I interrupt the Court. I feel that this is based upon sheer conclusions, speculation. There is no foundation laid at all that this officer was ever a witness to this accident or that he has any present memory of what actually occurred or with reference to any of the physical debris, if any, there. I feel this is prejudicial. The Court: It is all subject to your motion to strike and he will go ahead with it now and I assume that you are making the same objection to all portions of the testimony. . . . Mr. Gabler: If your Honor please, I move to strike this entire testimony on the ground there is absolutely no foundation. The Court: Just a minute, counsel. I said we would reserve all of your objections. Mr. Gabler: If your Honor please, I feel this is highly improper to reserve a motion to strike this testimony which is not proper and calls for hearsay. The Court: That is what has been done.'' The motion to strike when made was denied and came at a time when it would have been futile even if granted. The evidence had been heard by the jurors whose disregarding it could be nothing better then theoretical.

 By stipulation the record has been augmented to show that plaintiff requested the giving of BAJI instruction number 144-A (revised), concerning prima facie speed limit and basic speed law. The court did not give it. In the form in which tendered it is copied in the footnote,[3] but the court did give BAJI 149 (revised).[4] This left the jury without

---

[3]BAJI No. 144-A (revised): ''The prima facie speed limit at the place where the accident occurred was 40 miles per hour. This fact is one to be considered by you, together with all of the other evidence in determining whether or not the defendant was negligent, but proof that a vehicle was traveling at a speed greater or less than 40 miles per hour does not, in and of itself, prove that the driver of that vehicle was or was not negligent.

''The test is: was the vehicle operated at a speed which violated the basic speed law of this State as set forth in Section 510 of the Vehicle Code and which reads as follows:

'' 'No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.'

''A violation of this basic rule is negligence.''

[4]BAJI No. 149 (revised): ''If a party to this action violated Vehicle Code Section 577 or Section 510 of the statutes just read to you, a presumption arises that he was negligent. This presumption is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable or justifiable.

''To prove that a violation of a statute such as that charged in this

knowledge of section 510 of the Vehicle Code which is quoted in said BAJI No. 144-A (revised). The posted speed limit in the area was 40 miles an hour and Officer Hyde said the basic speed was 25 miles. Hislar testified he was going about 35 miles in the last block before Military Avenue, but the impact and the stopping distance of defendant's truck were such that the jury well could have found that its speed exceeded 40 miles, and the refusal to give the requested instruction was error. See *Hardin* v. *San Jose City Lines, Inc.*, 41 Cal.2d 432, 439 [260 P.2d 63]; *Ferrula* v. *Sante Fe Bus Lines*, 83 Cal.App.2d 416, 418-419 [189 P.2d 294]; *Stout* v. *Southern Pacific R.R. Co.*, 127 Cal.App.2d 491, 503 [274 P.2d 194].

Pertinent here is the language of *McAllister* v. *Cummings*, 191 Cal.App.2d 1, 7-8 [12 Cal.Rptr. 418]: "It is familiar law that each party is entitled to instructions covering his theory of the case when supported by substantial evidence. (48 Cal.Jur.2d § 188, p. 216.) Respondent says that the instructions actually given sufficed for this purpose. He cites instructions upon 'right of way defined,' 'duty of every person using highway,' 'duty of driver of vehicles on public highways,' and 'violation of statute or ordinance,' in that connection. But these instructions were, as was said in *Gilbert* v. *Pessin Grocery Co.*, 132 Cal.App.2d 212, 224 [282 P.2d 148], 'general while the requests of plaintiff gave specific application of the same principle to her theory of the case. They are correct in their content and appellant should not have been required to rest upon generalities.' Novak v. *Peira*, 175 Cal.App.2d 29, 33 [345 P.2d 349]: 'A court instructing a jury on the amount of care required must relate that duty to both the degree of care and the circumstances peculiar to the case being tried.' . . .

"In determining whether the refusal to give this correct qualifying instruction worked prejudicial error, the following rule is to be borne in mind: 'It is true that in determining whether or not a verdict is supported by the evidence, we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the instruction

case was excusable or justifiable so as to overcome the presumption of negligence, the evidence must support a finding that the person who violated the statute did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances."

favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.' (*O'Meara* v. *Swortfiguer*, 191 Cal. 12, 15 [214 P. 975].)''

Appellant also argues that ''[t]he trial court's comments, remarks and statements prejudiced plaintiff's cause and prevented her from having a fair trial.'' There is some substance to this contention, as exemplified by the following specific instances.

1. Hislar had testified that his skid marks were 19 feet long but had said in his deposition they were 4 to 5 feet in length. Plaintiff's counsel undertook to impeach him through use of the deposition: ''Q. About how many feet of skid marks did you leave down from your truck just before you got to the place where the collision occurred? A. 19 feet. Mr. Gabler: On Page 17, your Honor, for reference, starting at Line 5 of his deposition through Line 13. The Court: Isn't that something that has been subject to measurement and we can get out positive testimony one way or the other? Mr. Gabler: Well, there is an inconsistency here, your Honor. The Court: There is no inconsistency with a fact, is there? Mr. Gabler: That is correct. The Court: Well, people can vary in their opinions concerning facts, but if we have got a measurement of the skid marks, why don't we have that. Mr. Gabler: I feel that the section I am about to read from the deposition shows that there is a gross variance and that is the purpose for which I want to read it. The witness said 19 feet. The Court: All right. What is the fact. Do you know that? Mr. Gabler: Yes, I do. The Court: All right. Let's get the facts out.'' Thus the effect of the impeachment was largely impaired by undue interference on the part of the court. Counsel persisted, however, until he had shown that the witness did give a length of 4 to 5 feet in his deposition, and that his testimony of 19 feet was based upon what his attorney told him.

2. Prior to argument the court discussed with counsel the instructions to be given and they were told that there would be one on contributory negligence. Counsel argued that issue to the jury and the court at the close of the arguments told them, in the absence of the jury, that he was ''beginning to have some serious doubts as to whether or not there is any basis for contributory negligence. You made no reference to it at all, Mr. Tucker, in your argument and as presently advised I am pulling all of the instructions relating to con-

tributory negligence." Counsel then discussed the matter with the court; the judge said: "All right, gentlemen," and immediately proceeded to instruct the jury, saying nothing about contributory negligence. Section 607a, Code of Civil Procedure, provides: ". . . Before the commencement of the argument, the court, on request of counsel, must: (1) decide whether to give, refuse, or modify the proposed instructions: (2) decide which instructions shall be given in addition to those proposed, if any; and (3) advise counsel of all instructions to be given. However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof." Counsel for plaintiff at the conclusion of the instructions should have requested an instruction that plaintiff could not be found guilty of contributory negligence, but the responsibility was not all his; the judge had a duty. The matter had been argued and the jurors, in the face of the court's silence on the subject, probably continued to consider that issue and may have based their verdict upon that concept. The court, in warning counsel before argument to limit the same to a discussion of the facts, added this comment: "I sometimes fool counsel and don't do what they think I am going to do, so you are well advised to keep off the field which you cannot touch upon in any case." Unintentionally that was the result of the court's method of handling the instructions at this juncture of the case. Certainly his procedure violated the spirit if not the letter of the statute. Regardless of any specific request by plaintiff, the judge under the peculiar circumstances should have told the jury that there was no contributory negligence in the case. (See *Thomas* v. *Buttress & McClellan, Inc.*, 141 Cal.App.2d 812, 819-820 [297 P.2d 768].) This he did not do.

3. During the argument of plaintiff's attorney the court emphatically instructed counsel that it was improper for him to mention to the jury the fact that the court probably would give an instruction to a certain effect. We quote: "The Court: Wait a minute. I don't want any more citation of instructions or what his Honor is going to say. You know that is an improper province for argument by counsel. That applies to both of you and I am going to restrict it and preclude it completely. Your function is to discuss and argue the facts, not the law. . . . Now, Mr. Gabler, I just finished warning you. I want no more reference to the instructions I am going to give. That is not the proper function of argu-

page number
114

ment by counsel.'' Counsel then asked: ''If your Honor please, may I discuss the law applicable to this case?'' and received this response: ''You know the proper function of counsel. You may argue the facts, the facts in relation to the case. You don't need to argue the law. It is sufficient for you to urge upon the jury the fact that your interpretation of the facts justifies this and that interpretation or verdict, but you don't need to argue or assert to the jury what the instructions are going to be. You know that is an improper function of counsel. MR. GABLER: If your Honor please, I take exception to the Court's statement that I know that is improper. THE COURT: You should know it and I will have no further words on it.''

■■■ While the trial judge properly may insist that counsel not undertake to tell the jury what he, the judge, will say, it is quite another matter to preclude him from discussing the pertinent law and its application to the facts. That is the attorney's right as advocate of his client's cause. In *People* v. *Molina,* 126 Cal. 505, 508 [59 P. 34], the Supreme Court said: ''In the leading case of *Tucker* v. *Henniker,* 41 N.H. 323, it is said: 'The right of discussing the merits of the cause, both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. . . .' '' *People* v. *Dykes,* 107 Cal.App. 107, 118 [290 P. 102] : ''That counsel may, in his argument, state what the law is and apply the law to the facts in the case is well established in California, provided, of course, the statement of what he considers the law to be is correct.'' This language was quoted in *De Armas* v. *Dickerman,* 108 Cal. App.2d 548, 553 [239 P.2d 65]. In this case counsel's presentation required a discussion of through highways, the duties and rights of persons entering, crossing and traversing such an artery, the meaning of immediate hazard, the law of right-of-way with its meaning and limitations; what constituted an intersection in the peculiar facts at bar; the effect of a posted speed limit; the duty of keeping a lookout for intersecting traffic; and numerous other law points. Without such discussion he could not make the facts really meaningful. Of course, such mention of legal principles is subject to reasonable control of the court. (*People* v. *Baldwin,* 42 Cal.2d 858, 871 [270 P.2d 1028] ; *People* v. *Chessman,* 38 Cal.2d 166, 188 [238 P.2d 1001].) What the court said in *People* v. *Travis,* 129 Cal. App.2d 29, 37 [276 P.2d 193], is peculiarly pertinent here: ''The rulings of the court confused argument with evidence.

The ground of the rulings was that in the course of argument to a jury counsel in the case may recount or read nothing that has not been received in evidence. This concept of what is proper by way of argument is contrary to well-recognized privileges and practices of the profession as old as the law itself.'' The court's manner and words definitely went beyond the domain of reasonable control of counsel and were an undue interference with his presentation of plaintiff's case.

We have concluded, as did the court in *Delzell* v. *Day,* 36 Cal.2d 349, 351 [223 P.2d 625], that the cumulative effect of the errors above discussed was so serious as to require a reversal. In other words, we conclude after an examination of the entire cause, including the evidence, that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the errors herein discussed, and that therefore there has been a miscarriage of justice. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed.

Fox, P. J., and Herndon, J., concurred.